# Exhibit 1

Proposed Amended Complaint

**United States District Court
District Of Connecticut**

**Brian Ebron,**
*Plaintiff*

No. 3:25-CV-00363 (SRU)

*v.*

April 2, 2026

**Jennifer Medina Zaccagnini,
Rufaro Berry, Joy Chance,
Michael Pohl, Nancy Turner,
Deborah Smith-Palmieri, Sergio
Rodriguez, Robert Cizauskas,
Aileen Keays, and Alex Tsarkov,**
*Defendants*

**Proposed Amended Complaint**

**Nature of this action.**

1.      Since 2015, the Connecticut legislature and judiciary have grappled with the ramifications of sentencing young people to decades in prison.  With time, policymakers rightly came to understand that children's brains are not fully developed until at least their mid-twenties, and the law has begun to evolve to recognize that children sentenced to decades in prison deserve a chance to demonstrate they are ready to return home to their families.

2.      The Connecticut legislature's first effort to address the problem focused on children under the age of eighteen.  Then, in 2023, the legislature expanded its youth parole statute to include people who committed crimes under the age of twenty-one.

3.      At least, it tried to do so.

4.      Unfortunately, what passed in 2023 fell short.  The legislation purported to expand youth-based parole eligibility but contravened its very purpose by conditioning a

1

person's eligibility for parole on the date that they were sentenced.  Due to this sentencing date cut-off, over one hundred people are excluded from consideration for youth-based parole because they were sentenced after October 1, 2005, not because they were twenty-one or older at the time they committed a crime.

5.    Mr. Brian Ebron is one of these people.  He was sentenced in 2007 for a crime committed at twenty years old.  He has a supportive and loving family as well as a strong support network.  Mr. Ebron is eager to apply for parole consideration.  And yet, he is ineligible for parole for the sole reason that he was not sentenced until March 2007.

6.    Such patently arbitrary line drawing fails rational basis review.


**Jurisdiction and venue.**

7.    This Court has jurisdiction over Mr. Brian Ebron's 42 U.S.C § 1983 claim, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

8.    Venue is appropriate in this judicial district, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Mr. Ebron's claims occurred in the District of Connecticut.


**The parties.**

9.    Plaintiff Brian Ebron is a forty-three-year-old man.

10.    He is currently incarcerated at Osborn Correctional Institution.

11.    Defendant Jennifer Medina Zaccagnini is the chairperson of the Board of Pardons and Paroles ("BOPP").  As chairperson, Ms. Zaccagnini is "the executive and administrative head of [the] board . . . . " Conn. Gen. Stat. § 54-124a(d).  As an entity, the BOPP is imbued with "independent decision-making authority to [ ] grant or deny parole

2

in accordance with sections 54-125, 54-125a, 54-125e and 54-125g . . . ." *Id.* § 54-124a(f). It is comprised "of ten full-time and up to five part-time members." *Id.* § 54-124a(a)(1).

12.    Defendants Rufaro Berry, Joy Chance, Michael Pohl, Nancy Turner, Deborah Smith-Palmieri, Sergio Rodriguez, Robert Cizauskas, Aileen Keays, and Alex Tsarkov are members of the BOPP.

13.    All Defendants are sued in their official capacity.  Each Defendant is a person within the meaning of 42 U.S.C. § 1983, and each was acting under color of state law at all times relevant to this complaint.

**Factual allegations.**

14.    Over the past two decades, the Supreme Court has repeatedly found certain excessive punishments unconstitutional.  *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551 (2005) (death penalty for juveniles); *Graham v. Fla.*, 560 U.S. 48 (2010) (life without parole sentence for juveniles who did not commit a homicide); *Miller v. Alabama*, 567 U.S. 460 (2012) (mandatory life without parole for juveniles); *Montgomery v. Louisiana*, 577 U.S. 190 (2016) (applying *Miller* retroactively).

15.    This line of cases led to important constitutional safeguards, particularly for young people subjected to lengthy sentences.  Recognizing that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments,'" *Miller*, 567 U.S. at 465, the Supreme Court explained that  "a judge or jury must have the opportunity to consider mitigating circumstances before imposing" a life without parole sentence on a child, *id.* at 489.  It then applied this individualized sentencing requirement retroactively such that

3

every child who previously "received mandatory life without parole," must either be resentenced or at least considered for parole.  *Montgomery*, 577 U.S. at 212.

16.    During the same period, the Connecticut judiciary and legislature were likewise called on to grapple with constitutional limits of punishment, especially in instances where young people were condemned to spend decades in the state's prisons.

17.    Following *Miller*, the Connecticut Supreme Court answered the question that would be raised a year later in *Montgomery* and went a step further, concluding that *Miller* announced a "watershed rule of criminal procedure that must be applied retroactively," *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1037 (Conn. 2015), and holding that to trigger *Miller's* protections a sentence need not "continue until the literal end of one's life," *id.* at 1045.  Thus, after *Casiano*, a fifty-year sentence without the possibility of parole was enough to trigger *Miller's* individualized sentencing mandate, even where a child was sentenced decades earlier.  *Id.* at 1043, 1047–48.

18.    Justice McDonald ended the majority opinion in *Casiano* with a prescient observation: he surmised that the Court's decision "in the present case" would likely "prompt [the Connecticut] legislature to renew earlier efforts to address the implications of the Supreme Court's decisions in *Graham* and *Miller*."  *Id.* at 1047.

19.    He was correct.

20.    In June 2015, just one month after *Casiano*, the Connecticut legislature implemented a new parole eligibility scheme for young people.  In passing Public Act No. 15-84 ("P.A. 15-84"), the legislature provided an opportunity for early parole to any person,

> convicted of one or more crimes committed while such person was under
> eighteen years of age, who is incarcerated on or after October 1, 2015, and

4

who received a definite sentence or total effective sentence of more than ten years for such crime or crimes prior to, on or after October 1, 2015 . . . .

P.A. 15-84, Ex. 2 (adding subsection f(1) to Conn. Gen. Stat. § 54-125a).

21.    Since 2015, at least 123 individuals have benefited from the statute, and, of those 123 beneficiaries, only 11 percent have recidivated—a figure that is "significantly lower than recidivism rates for the general prison population, as estimated by Connecticut's Office of Policy and Management."  Connecticut Sentencing Commission, *Report on Public Act 15-84 Outcomes* 5–6 (2026).  And, at the same time, the literature on brain development and sentencing continued to crystallize.  *E.g.*, Center for Law, Brain & Behavior at Massachusetts General Hospital, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers* (2022).

22.    To "make the law consistent with neuroscience that establishes that the human brain is still developing until a person's mid-twenties[,]" *see* P.A. 23-169 Joint Favorable Report, Ex. 3, the legislature set out to expand the parole eligibility scheme set forth in P.A. 15-84.

23.    On February 6, 2023, Senate Bill 952 was referred to Connecticut's Joint Committee on Judiciary.  Originally, the bill mirrored P.A. 15-84.  It simply expanded youth parole eligibility by raising the age from eighteen to twenty-five.  As proposed, the bill would have provided an opportunity for early parole to any person,

convicted of one or more crimes committed while such person was under twenty-five years of age, who is incarcerated on or after October 1, 2015, and who received a definite sentence or total effective sentence of more than ten years for such crime or crimes prior to, on or after October 1, 2015 . . . .

Raised Bill No. 952, Ex. 4 (proposing a modification of Conn. Gen. Stat. § 54-125a(f)(1)).

24.    But the bill was amended.  *See* Senate Bill 952 Amendment, Ex. 5.

5

25.    As amended, the bill created a very different parole scheme: "[a] person convicted of one or more crimes committed while such person was [between eighteen and] twenty-one years of age," could be eligible to be considered for parole only if they were *"sentenced on or before October 1, 2005, and [ ] received a definite sentence or total effective sentence of more than ten years' incarceration for such crime or crimes committed on or before October 1, 2005 . . . ."* *Id.* (emphasis added) (proposing to add a new section (g)(1) to Conn. Gen. Stat. § 54-125a rather to modify section (f)(1)).

26.    On June 21, 2023, the amended bill was assigned Public Act No. 23-169 ("P.A. 23-169"), and, on June 28, 2023, the Governor signed it into law.

27.    Later, P.A. 23-169 would be codified at Conn. Gen. Stat. § 54-125a(g)(1).

28.    Although P.A. 15-84's straightforward parole scheme continues to govern where an individual committed a crime under eighteen, P.A. 23-169 subjects individuals who committed a crime between the ages of eighteen and twenty-one to irrational legislative line drawing: those serendipitously sentenced before October 1, 2005, are eligible for youth-based parole but those sentenced after are not.

29.    Due to this sentencing date cut-off, very few people are eligible for relief under the statute.  As of October 1, 2023—P.A. 23-169's effective date—at least 153 people were incarcerated in Connecticut for a crime committed while under the age of twenty-one.  But of those people, only thirty-five were sentenced prior to October 1, 2005.

30.    There is no rational basis for P.A. 23-169's sentencing date cut-off.

31.    P.A. 23-169 was intended to provide people who committed crimes when they were under twenty-one an additional opportunity to seek parole.

32.    As State Representative Craig Fishbein stated on the record: "You know, the underlying intent [of the legislation] was and is to try and help those kids that had been

6

convicted of serious crimes to give them an opportunity to show that they have been rehabilitated. To try and reverse some of the harsh sentences that sometimes are rendered in our courts." Excerpt of Senate Bill No. 952 House Record, Ex. 6, at 516.

33. But the October 1, 2005, date cut-off is divorced from each stated purpose.

34. Far from helping young people, the date cut-off limits opportunities for them to show that they have been rehabilitated. And it imposes this restriction based only on the happenstance of when a court proceeding occurred.

35. The sentencing date also does not track the harshness of Connecticut's sentencing regime. After October 1, 2005, the legislature increased penalties such that its sentencing regime was even harsher. *E.g.*, P.A. No. 08-51, Ex. 7 (increasing mandatory minimum for "persistent dangerous felony offenders"). The legislature established the state's sentencing commission six years later in 2011, but the legislature would not begin to implement major sentencing reforms for years to come.

36. Representative Fishbein acknowledged as much. As he recounted it on the record, the bill, as amended, "addresses convictions pre 2005," but "the reforms in this state really started in 2010." Excerpt of Senate Bill No. 952 House Record, Ex. 6, at 517.

37. Further, the trajectory of Connecticut's prison population confirms that October 1, 2005, is disconnected from the severity of the state's sentencing regime.

    a. In 1969, Connecticut had a prison population of 3,112.

    b. By 2005, Connecticut's prison population had ballooned to 18,500.

    c. But it continued to climb, until it peaked in 2008 at 19,413.

    d. The population would not return to below the 2005 level until 2011.

    e. To date, the prison population has not dipped below 9,000 people.

38.    Ultimately, nothing in the legislative record provides a legitimate justification for the statute's arbitrary sentencing date cut-off.  But neither are there any theoretical reasons that could plausibly sustain the October 1, 2005, date.  This is because:

    a.  The date is not tied to the age at which someone committed a crime;

    b.  The date is not related to developmental science;

    c.  The date does not track any relevant sentencing reforms in Connecticut;

    d.  The date does not reduce the state's administrative or financial burden;

    e.  The date is not tied to recidivism rates; and

    f.  The date, instead, exacerbates racial disparities present in sentencing.

39.    In short, P.A. 23-169 results in an irrational scheme.  One group of people has an opportunity to tell their story and potentially return home to be with loved ones, while the other group is denied that grace based on nothing more than an arbitrary date.

40.    Mr. Ebron falls into the latter group.  He cannot present his application  to the BOPP for the sole reason that he was sentenced after October 1, 2005.

41.    Mr. Ebron was born on November 30, 1982, in Augusta, Georgia.

42.    When he was three years old, he was taken to live in Connecticut.

43.    At seven, he learned that his mother was killed in a drug-related incident.

44.    For years, he grieved her death.  But, when he was eleven, Mr. Ebron's reality was flipped upside down after he discovered that his mother was still alive.

45.    That's when Mr. Ebron's life took a turn for the worse.

46.    Scarred by his mother's absence, he began hanging out with the wrong crowds.  He was taunted and harassed for his family situation; he was forced to enroll in an "alternative" school; and he had several run-ins with the criminal legal system.

47.    Eventually, Mr. Ebron dropped out of school.

48.    On November 18, 2003, he committed the underlying offense.

49.    At the time he was twenty years old.

50.    On March 27, 2007, Mr. Ebron was sentenced to 32 years in prison.

51.    His sentence was later adjusted downward to 27 years.

52.    Even so, he was to be incarcerated for the rest of his young adult life.

53.    Sixteen years later Senate Bill 952 offered Mr. Ebron a glimpse of hope. Originally, it would have opened a pathway for young people, like him, to be parole-eligible after completing sixty percent of their sentence.  In fact, on the day the bill was filed with the Legislative Commissioner's Office, Mr. Ebron would have been eligible for parole under the first iteration Senate Bill 952.

54.    After learning about the bill, Mr. Ebron was eager to apply for parole.

55.    He has been unable to been able to hug his mother since he was three years old—more than forty years ago.  He wants to hug her before it is too late.

56.    Mr. Ebron is also a loving husband and father.  He misses his family dearly and has a strong support system for when he returns home, even after years away.

57.    But under P.A. 23-169, none of that matters.  Mr. Ebron is ineligible for youth-based parole for the sole reason that he was not sentenced until March 2007.

**Claim for relief.**

(42 U.S.C. § 1983 – Fourteenth Amendment: Equal Protection)

58.    P.A. 23-169's October 1, 2005, sentencing date cut-off violates Mr. Ebron's rights under the Equal Protection Clause of the Fourteenth Amendment.

59.    In modifying Connecticut's youth parole scheme, P.A. 23-169 creates two groups: (1) those sentenced before October 1, 2005, and (2) those sentenced afterward.

9

60.     P.A. 23-169 discriminates against individuals who committed crimes under the age of twenty-one and before October 1, 2005, but were sentenced thereafter.

61.     This distinction was deliberate.  It was added to P.A. 23-169 as part of a proposed amendment and noted by the proponent of the amendment as a reason he supported the bill.  After he urged support, the clerk called the bill for a vote.  It passed.

62.     P.A. 23-169's sentencing date cut-off has no rational relationship to any legitimate governmental interest.  It, thus, deprives Mr. Ebron of his right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.

**Request for relief.**

WHEREFORE, to protect his right to equal protection guaranteed by the Fourteenth Amendment, Mr. Ebron requests that this Court:

63.     Declare that the Conn. Gen. Stat. § 54-125a(g)(1) sentencing date cut-off violates the Fourteenth Amendment to the United States Constitution;

64.     Permanently enjoin Defendants from enforcing § 54-125a(g)(1)'s sentencing date cut-off;

65.     Grant Mr. Ebron reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988(b), and other applicable law; and

66.     Grant such other relief as the Court considers just and proper.

<u>/s/ Joseph Gaylin</u>
Joseph Gaylin (#ct32089)
Dan Barrett (#ct29816)
Jaclyn Blickley (#ct31822)
ACLU Foundation of Connecticut
P.O. Box 230178
Hartford, CT 06123
(860) 471-8471
e-filings@acluct.org

11